NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0382n.06

No. 20-1381

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PIERRE LAMAR TAYLOR, | ) | **FILED** |
| | ) | Aug 11, 2021 |
| Petitioner-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| SONAL PATEL, Warden, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-.Appellee. | ) | |
| | ) | |

BEFORE:  SUTTON, Chief Judge; DAUGHTREY and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Pierre Lamar Taylor was charged with manslaughter in Michigan state court after several eyewitnesses identified him as the shooter in an incident at a "street race" (an illegal event akin to drag racing) in Detroit in the early hours of June 12, 2011.  That night, 17-year-old Arman Najy went for a ride with Saleh Sayah and two other friends to pick up someone at the races.  When leaving the area Sayah made a U-turn to avoid a closed-off street, and his car came close to a man in the street.  The man—later identified as Taylor—pulled out a gun and shot into the trunk of the car.  The bullet went through the trunk and into the backseat, hitting and fatally wounding Najy.  After his arrest, Taylor insisted that although he was in fact at the street race that night and was carrying his licensed handgun, he was with his family the entire time and was not involved in the shooting.  Taylor's counsel had him testify in this vein at his preliminary examination, in response to several eyewitness accounts identifying Taylor as the shooter, apparently in an unsuccessful effort to avoid a bind-over.  Taylor secured

new counsel for trial and, shortly before trial began, Taylor told his new attorney that he was mistaken about the dates and, in fact, was not at the street race on the night in question. Instead, he said, he was riding his motorcycle with one of two people. Taylor's counsel claimed to have spoken with both potential alibi witnesses. But because neither of them corroborated Taylor's alibi, he ultimately did not call them at trial. After Taylor was convicted, he claimed that both of his attorneys provided ineffective assistance of counsel. The state court trial judge held a hearing and determined that Taylor's ineffective assistance claims were without merit.

The Michigan Court of Appeals affirmed, and the Michigan Supreme Court denied review. Taylor then petitioned the federal district court for habeas relief, which was denied. However, the district court issued a certificate of appealability on two issues, and we granted an expansion of the COA to one additional issue. Now before us is whether the Michigan Court of Appeals unreasonably decided that Taylor's counsel did not render ineffective assistance by (1) having him testify at his preliminary examination, (2) failing to move to have the preliminary examination testimony suppressed at trial, and (3) failing to contact, interview, and present Taylor's alibi witness. Because of the "doubly-deferential" standard imposed by AEDPA and *Strickland v. Washington*, 466 U.S. 668 (1984), we conclude that the district court correctly denied habeas relief.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:00 a.m. on June 12, 2011, Arman Najy and three friends left work in Bloomfield Hills, Michigan, in Saleh Sayah's white Impala, with Sayah driving. They received a call from another friend asking them to pick him up from a street race in Detroit, which they agreed to do. When they arrived at the race, they did not stay but picked up their friend and began to leave. With three people in the back seat, including Najy, Sayah soon realized that the street was blocked off, forcing him to make a U-turn. As he backed up to turn around, the car got close to a

man standing there, who then pulled out a gun and pointed it at the car. Sayah gestured to the man, as if to apologize for getting too close to him, then started to drive away. The man, later identified as Taylor, then shot into the car. The bullet went through the trunk and into the backseat, hitting Najy.

When Sayah realized Najy had been struck with the bullet, he tried to rush him to the hospital, but he lost control of the car, which rolled over and crashed, totaling it and injuring its passengers. Najy later died as a result of the gunshot wound.

After the accident, the occupants of the car and several additional witnesses gave police accounts of what happened. Sayah described the shooter as tall and skinny, with high cheek bones, half-braided hair, and wearing dark clothes. Hassem Salem told the police that the shooter was 5'8'' to 5'9'' with braids and dressed in a black shirt. Joseph Salvidar, who was present at the race and witnessed the U-turn and shooting, returned to the area some weekends later and saw a man whom he recognized as the shooter. He notified police of the shooter's license plate, which was on a red Dodge Magnum. Salvidar later met with the detectives to review a photo line-up and identified a picture of Taylor as the shooter. Ivan Tarrant regularly attended the street races and recorded a video of the defendant after the shooting occurred. Several days after the shooting, Tarrant heard that someone had died as a result of the shooting and gave police a recording—albeit an unclear one—that he took on June 12. Tarrant also identified Taylor from a photo line-up. Robert Hanson, another witness who was at the street race on the night in question, testified at trial that he was standing about 20 feet from the shooter during the incident and described him to police as having high cheek bones. Two weeks later, he saw the shooter arrive at the race in a red Dodge Magnum and texted the detective the license plate number.

Police issued a warrant for Taylor's arrest because the license-plate number was connected to his household and because of the photo identifications of Taylor by multiple witnesses. The state charged Taylor with murder in the second degree, involuntary manslaughter, and felony possession of a firearm. Taylor secured counsel, Ronald McDuffie, who represented him at his preliminary hearing. Prior to the hearing, McDuffie visited Taylor in jail three times. On the second visit, McDuffie gave Taylor a packet of discovery materials and asked Taylor to review it closely and write up any comments he had. He picked up Taylor's notes on the third visit. Taylor was adamant that he did not commit the crime, stating that he had been at the races that night but claiming that it was a case of mistaken identification. So, McDuffie decided that there was a possibility of getting the case thrown out if Taylor testified at his hearing and then passed a polygraph test with the same testimony.

Taylor agreed to testify at the preliminary hearing. Salem and Tarrant first testified as eyewitnesses, identifying Taylor as the shooter. When Taylor took the stand, McDuffie asked him if he was in Detroit at approximately 1:00-2:00 a.m. on June 12, 2011. Taylor responded that he was in fact in Detroit that night with his family to watch the street races and had a handgun with him, for which he had a permit. The court found that there was contradictory testimony and bound over Taylor for trial.

Prior to trial, Taylor hired new counsel, Antonio Tuddles. Tuddles did not necessarily understand why McDuffie had chosen to have Taylor testify at the preliminary hearing, but he nonetheless considered it a matter of trial strategy. After a pre-trial evidentiary hearing, Taylor pulled Tuddles aside and said that, after further thought, he had realized that he was not actually at the street races on the night of the shooting. Tuddles was then faced with developing an alibi defense in addition to presenting the misidentification defense.

Taylor told Tuddles that on the evening of June 11, 2011, he was riding motorcycles with either Anthony Simpson or Jeff Mathes, a Wayne County Sheriff's Deputy. Tuddles and Taylor contacted Simpson, at which point Taylor realized that it must have been Mathes with whom he had been riding at the time. But, Taylor did not get Mathes's contact information to Tuddles until trial. Tuddles later testified that he contacted Mathes, but Mathes said that he did not know whether he was riding with Taylor on the night in question. Tuddles said that he conveyed this information to Taylor and explained why he could not call Mathes as a witness to support Taylor's alibi defense. At a post-conviction hearing, however, Mathes testified that he did not recall Tuddles ever contacting him. He said that despite not remembering the date, he did ride motorcycles with Taylor once, during the "evening hours."

At trial, Hanson, Salvidar, Salem, and Sayah testified, all identifying Taylor as the shooter. Tarrant could not be procured as a witness, so, under Michigan Rules of Evidence 804, the testimony that he gave at the preliminary hearing was read to the jury.[1] Several of Taylor's family members testified in support of his claim that he was not at the races on the night in question. Taylor also testified on his own behalf, saying that he was with either Simpson or Mathes on June 11, but was home by 2:30 a.m. on June 12. The jury ultimately found Taylor guilty of involuntary manslaughter, and the trial court sentenced him to six-to-fifteen years for manslaughter and two years for his felony-firearm conviction.

In the course of preparing for a post-conviction evidentiary hearing on a claim of ineffective assistance of counsel, Taylor learned that Hanson, a prosecution witness, had

---

[1] Taylor also challenged Tuddles's decision to allow Tarrant's preliminary hearing testimony to be read at trial as grounds for ineffective assistance of counsel. There was a hearing to demonstrate that the prosecution exercised due diligence in trying to procure the witness. And, Tuddles explained at the post-conviction hearing that allowing the testimony to be read was preferable to having another live eyewitness positively identify Taylor as the shooter in front of a jury. The district court held that the state court's decision on this issue was reasonable and declined to include it in the COA. For our part, we declined to expand the COA to include this issue.

committed perjury at trial. The trial court found that because Hanson testified falsely and because the prosecution was aware of it, a new trial was warranted. The State appealed the ruling, and the Michigan Court of Appeals reversed and ordered reinstatement of Taylor's convictions and sentences. The appeals court concluded that the trial judge erred in finding that the prosecutor *knowingly* presented the perjured testimony, that Hanson's testimony was not "material" in the case because there were several other eyewitnesses that provided similar testimony, and that there was no "reasonable likelihood that the false testimony could have affected the judgment of the jury." The Michigan Supreme Court denied leave to appeal.

The trial court then held another hearing on Taylor's claims of ineffective assistance of counsel and found that Taylor was not entitled to a new trial on those claims. Taylor appealed, the Michigan Court of Appeals affirmed the decision, *People v. Taylor*, No. 310771, 2016 WL 5886316, at *9 (Mich. Ct. App. Oct. 6, 2016), and the Michigan Supreme Court once again denied review.

Taylor then filed his petition for habeas relief in federal court, raising three grounds: that his trial counsel rendered ineffective assistance of counsel, that the state court's factual findings were unreasonable, and that the prosecution's presentation of Hanson's perjured testimony denied Taylor a fair trial. The district court denied the petition, finding that the state court's decisions on Taylor's claims were objectively reasonable. The district court issued a certificate of appealability on "Taylor's ineffective assistance of counsel claims arising from McDuffie's decision to call Taylor to testify at the preliminary examination and Tuddles's failure to move to exclude the admission of that testimony at trial." In response to Taylor's application for the expansion of his COA, we granted his request with respect to his claim that Tuddles was ineffective for not investigating and calling Jeffrey Mathes as an alibi witness at trial. *Taylor v. Patel*, No. 20-1381

(6th Cir. Sep. 30, 2020) (order). It is these three claims of ineffective assistance of counsel that are now under review.

## DISCUSSION

**Standard of Review**

When a habeas claim has been properly presented and adjudicated on the merits in a state court, a heightened standard of review is required by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017). Under this standard, a federal court

> may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . or (2) the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)) (internal quotation marks omitted). An unreasonable application of federal law occurs when a state court "'unreasonably extends a legal principle from our precedent to a new context where it should not apply . . .'" or "when it 'unreasonably refuses to extend that principle to a new context where it should apply.'" *Id.* at 851 (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The analysis cannot "overlook[] arguments that would otherwise justify the state court's result." *Id.* at 102 (explaining that the standard was meant to be difficult to meet). Under AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

**Evaluating Ineffective Assistance of Counsel:  *Strickland v. Washington***

We  evaluate claims of ineffective assistance of appellate counsel under the *Strickland v. Washington* standard.   466 U.S. 668 (1984).   That standard "requires that the [defendant] affirmatively establish (1) that counsel's performance was objectively deficient; and (2) prejudice, which means that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Goff v. Bagley*, 601 F.3d 445, 462 (6th Cir. 2010) (quoting *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008)).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

Even under *de novo* review, "[s]urmounting *Strickland*'s high bar is never an . . . easy task," but it is "all the more difficult" to establish it under AEDPA.  *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).   Both the AEDPA and *Strickland* standards are "highly deferential," and "when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (explaining that the "unreasonable application prong" can be  satisfied only if a petitioner shows "there was no reasonable basis" for the state court's decision).

To find ineffective assistance of counsel under *Strickland*, the reviewing court must find that counsel's performance was deficient.  "To establish that counsel was deficient, 'the defendant

must show that counsel's representation fell below an objective standard of reasonableness.'" *Smith v. Mitchell*, 567 F.3d 246, 257 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 688). Under the first prong of *Strickland*, "[c]ounsel's performance is objectively unreasonable only where 'the identified acts or omissions were outside the wide range of professionally competent assistance,' as determined by 'prevailing professional norms.'" *United States v. Munoz*, 605 F.3d 359, 376 (6th Cir. 2010) (quoting *Strickland,* 466 U.S. at 690). The court should presume that counsel provided "adequate assistance" and "made all significant decisions" with "reasonable professional judgment." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690).

The other question under the *Strickland* analysis is whether the deficient performance caused prejudice, which requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This finding requires that the likelihood be "substantial," not just "conceivable." *Cullen*, 563 U.S. at 189 (citing *Harrington*, 562 U.S. at 112).

**McDuffie's decision to have Taylor testify at the preliminary hearing**

Taylor first contends that his initial counsel, McDuffie, was ineffective by advising Taylor to testify at his preliminary hearing. He argues that there was no reasonable strategy in having him testify because doing so "could only create an issue of fact that precludes dismissal under Michigan law."

In Michigan, a preliminary hearing functions "to determine [whether] a crime has been committed and, if so, [whether] there is probable cause to believe that the defendant committed it." *People v. Redden*, 799 N.W.2d 184, 195 (Mich. Ct. App. 2010) (quoting *People v. Glass*, 627 N.W.2d 261, 267 (Mich. 2001)). Such a hearing is a creature of statute and is "not

constitutionally required." *People v. Yost*, 659 N.W.2d 604, 606 (Mich. 2003). Probable cause requires evidence "'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief' of the accused's guilt." *Id.* at 607 (quoting *People v. Justice*, 562 N.W.2d 652, 657 (Mich. 1997)). Conflicting evidence will require the court to bind over the defendant for trial so that "the trier of fact can resolve the questions." *Redden*, 799 N.W.2d at 195 (citing *Yost*, 659 N.W.2d at 604).

McDuffie testified that he had strategic reasons to put Taylor on the stand at his preliminary hearing. He explained that Taylor was adamant that he was not involved in the shooting and needed to get out of jail immediately. Because Taylor agreed to take a polygraph test, McDuffie believed that having him testify at the hearing would create a transcript that—if aligned with his statements in a successful polygraph test—would warrant dismissal of the case. Taylor points out that there was no evidence to show that McDuffie made an agreement with the State regarding a polygraph and that any conversations with the trial prosecutor about a polygraph may have taken place only after the hearing. However, McDuffie claimed that the prosecutor suggested to him that if Taylor was being honest and could pass a polygraph and if there was weak testimony at the hearing by other witnesses, the evidence from Taylor's testimony and the polygraph could get the case dismissed. The trial prosecutor recalled discussing a polygraph test with McDuffie but was uncertain about when it occurred. He also said that his case file indicated that a colleague spoke to McDuffie prior to the hearing and left him a note indicating that "defense counsel believes this is a case of mistaken identity and that he wants to polygraph the defendant, or he's going to polygraph the defendant."

The Michigan Court of Appeals gave deference to the trial court's finding that McDuffie was credible and that "[p]resenting defendant's testimony at the preliminary examination [might]

have led the trial court to conclude that the prosecutor's witnesses were not credible." *Taylor*, 2016 WL 5886316, at *3. The court further noted that McDuffie could not have expected Taylor to change his recollection so drastically, from claiming misidentification to claiming that he was not present at the scene of the crime.

Although having a defendant testify at a preliminary hearing may be rare, the cases to which Taylor cites stand only for the proposition that when issues of fact are created or credibility is at issue at a preliminary hearing, the court must bind over the defendant for trial. *See Redden*, 799 N.W.2d at 195; *Yost*, 659 N.W.2d at 607-08. They do not preclude the strategy of putting the defendant on the stand at the hearing in an attempt to avoid a bindover or achieve the dismissal of charges. In the face of several eyewitnesses identifying Taylor as the perpetrator, putting Taylor on the stand may have appeared to be the only possible way to get the case dismissed. With a misidentification defense, there will often be an issue of fact. And if the state court recognized "any reasonable argument" that defense counsel satisfied *Strickland*'s standard, under AEDPA, we must affirm. *Harrington*, 562 U.S. at 105.

The Michigan Court of Appeals's conclusion that putting Taylor on the stand at his preliminary hearing was a valid strategy is not "so lacking in justification" that overturning its decision is warranted under AEDPA's heightened standard of review. *Id.* Because Taylor cannot show that McDuffie's decision rendered his performance deficient, it is unnecessary to evaluate whether the decision caused him prejudice.

**Tuddles's failure to move to exclude Taylor's preliminary examination testimony at trial**

Taylor next argues that Tuddles should have moved to exclude Taylor's preliminary-hearing testimony because it was the product of McDuffie's ineffective assistance. For the reasons set out above, it is unlikely that the state trial court would have considered McDuffie's pretrial

strategy to constitute ineffective assistance; indeed, the same court held that it did not in the post-conviction hearing on the issue. As the Michigan Court of Appeals put it: "Because [the] defendant fails to demonstrate that McDuffie's strategy was unsound, any [motion Tuddles could have made to suppress that testimony] would have failed. 'Counsel is not ineffective for failing to make a futile objection.'" *Taylor*, 2016 WL 5886316, at *4 (quoting *People v. Thomas*, 678 N.W.2d 631, 637 (2004)). This conclusion by the Michigan Court of Appeals is not an unreasonable application of federal law, nor is it an unreasonable determination of fact. As a result, it must be upheld under the deferential AEDPA standard.

**Tuddles's failure to contact, interview, and present alibi witness Jeffrey Mathes,**

Taylor next contends that his trial counsel, Tuddles, provided ineffective assistance of counsel by failing to contact, interview, and present alibi witness Mathes. But when Taylor first told Tuddles that he was not in fact at the races the night of the shooting—after initially declaring that he had been—Taylor could not recall who was riding motorcycles with him on the night in question. Taylor first said it was Simpson, but when Taylor and Tuddles called Simpson to confirm, Taylor said it was actually Mathes.

Tuddles had put Mathes on the witness list but claimed that he did not get the full information and phone number for Mathes until some point during trial. Tuddles testified that he ultimately declined to call Mathes as a witness because when he finally spoke with him, Mathes said that he had not been riding with Taylor on the night in question. At the post-conviction hearing, Mathes could not recall receiving a call from Tuddles. He also said that he did ride with Taylor one time in "the evening hours," but he did not remember the date.

Although failure to contact and present an alibi witness can constitute deficient performance, *Workman v. Tate*, 957 F.2d 1339, 1345–46 (6th Cir. 1992), if the deficiency could

-12-

not have affected the outcome of the trial, it does not warrant habeas relief. *See Towns v. Smith*, 395 F.3d 251, 259 (6th Cir. 2005). In *Workman*, we held that counsel was ineffective for completely failing to contact or interview two persons that the petitioner and others identified as connected to the event in question. 957 F.2d at 1345. Counsel had the contact information for the two potential witnesses and knew that they were the only witnesses, other than the defendant and police officers, who saw what happened in the moments leading up to the event at issue. *Id.* at 1345–46.

Here, whether Mathes would have aided Taylor's defense is much less clear. The Michigan Court of Appeals concluded that because Mathes could not recall the night they rode together or even that he was with the petitioner at the time when the shooting occurred, Tuddles's failure to call him as a witness at trial was of no consequence. "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *Taylor*, 2016 WL 5886316 at *7 (quoting *People v. Russell*, 825 N.W.2d 623, 716 (2012)) (internal quotation marks omitted) (additional citation omitted in original)).

Under AEDPA, when faced with a question of fact, we must presume that the state court's factual findings are correct. *Bigelow v. Williams*, 367 F.3d 562, 571 (6th Cir. 2004). Although the Michigan Court of Appeals never affirmatively determined that Tuddles spoke with Mathes, it did conclude that even if Mathes had testified, that testimony would have been of no consequence to the outcome of the trial. Although Mathes's testimony might have corroborated Taylor's testimony regarding his motorcycle ride, that testimony would not have placed Taylor in another location at the time of the shooting. Thus, because of the highly deferential AEDPA standard we must apply, this claim is insufficient to warrant habeas relief. The question is not whether there are arguments the state court did not consider; the question is whether there are any reasonable

arguments that justify the state court's results. *Harrington*, 562 U.S. at 105. Here, it cannot be said that the Michigan Court of Appeals's decision was baseless and, under AEDPA, we cannot overlook its justification. *Id.* at 102.

Under the deferential AEDPA standard, to establish entitlement to relief on a claim of ineffective assistance of counsel, a petitioner must show not only that counsel's deficient performance prejudiced him, but also that the state court was *unreasonable* in concluding that no such constitutional error occurred. Taylor cannot make that heightened showing in this case. Thus, the district court did not err in denying the petitioner the relief he seeks.

## CONCLUSION

For the reasons set out above, we **AFFIRM** the district court's decision to deny Taylor's petition for habeas relief and the resulting judgment.