*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BROOKLYNNE RAE DAVIS,

Defendant-Appellant.

FOR PUBLICATION
December 12, 2025
10:16 AM

No. 376119
Kent Circuit Court
LC No. 24-009460-FC

Before: M. J. KELLY, P.J., and REDFORD and FEENEY, JJ.

REDFORD, J.

In this interlocutory appeal, defendant, Brooklynne Rae Davis, appeals by leave granted[1] the order denying her motion to quash her bindover and her motion to dismiss. Defendant was charged with first-degree child abuse, MCL 750.136b(2). On appeal, defendant argues that bindover should have been quashed and the circuit court should have granted her motion to dismiss because the prosecution failed to present evidence of the intent element of first-degree child abuse. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from allegations that defendant failed to care for her 19-month-old twins, SS and AS, thereby causing the death of SS and threatening the life of AS. Initially, defendant was charged in separate cases. In relation to the deceased child, defendant was charged with first-degree murder committed in the perpetration of first-degree child abuse (felony murder), MCL 750.316(1)(b). Defendant waived a preliminary examination in that case by written waiver agreement and was bound over for the charges related to SS. In relation to AS, defendant was charged with one count of first-degree child abuse, MCL 750.136b(2), and was bound over on that

---

[1] *People v Davis*, unpublished order of the Court of Appeals, entered July 30, 2025 (Docket No. 373137).

-1-

charge after a preliminary examination. After both cases were separately bound over, the cases were consolidated in the trial court.[2]

At the preliminary examination, Detective Briana Pierson, a police officer of the Grand Rapids Police Department, and Dr. Cory Schmidt, a medical doctor who was qualified as an expert in pediatrics, testified. On August 22, 2024, police officers and medical personnel responded to defendant's home after defendant called the police and reported a deceased child. Upon arrival, authorities found defendant and her three children. Detective Pierson spoke to defendant while medical personnel attempted life-saving measures on SS. Defendant told Detective Pierson that she was the sole caregiver of AS. Despite the attempt at life-saving measures, SS was pronounced dead at the scene.

AS became Dr. Schmidt's patient at the Helen DeVos Children's Hospital on August 23, 2024. Dr. Schmidt observed AS and diagnoses him with the following conditions:

> He had hypernatremia, which is a very high sodium levels in his blood. He had severe malnutrition with a pretty tremendous amount of weight loss over time since the last time he had been seen by someone in our hospital system. He had a -- he had kidney injury and then he had some mild liver injury as well. And then he had what appeared to be pretty uncontrolled eczema on his skin that had gotten to the point where there were a few areas on his legs that were, what's called, excoriated, or where they're kinda open, almost like a large scab looking area that can happen if eczema is left untreated.

Additionally, AS was so malnourished and dehydrated that he had encephalopathy, which meant AS exhibited "an altered level of consciousness where he was not as awake," and it was "hard to keep him awake." Dr. Schmidt explained this can happen when the body's sodium levels become too elevated. Dr. Schmidt further explained that the "dangerously high" sodium level in AS's blood was evidence of AS's dehydration, as was the child's kidney injury, weight loss, and encephalopathy. He opined that the high sodium level and accompanying dehydration caused serious impairment to AS's health and well-being.

---

[2] On appeal, defendant challenges bindover in relation to both children. However, defendant has waived review of the charges related to SS. Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id.*, quoting *United States v Griffin*, 84 F3d 912, 924 (CA 7, 1996). "The purpose of a preliminary examination is to determine whether probable cause exists to believe that a crime was committed and that the defendant committed it." *People v Bennett*, 290 Mich App 465, 480; 802 NW2d 627 (2010) (quotation marks and citation omitted). Because defendant waived the preliminary examination, she waived review of whether there was probable cause to believe that a crime was committed. Therefore, we limit our review to whether there was probable cause to bind over defendant on the first-degree child abuse charge related to AS.

Additionally, Dr. Schmidt testified that AS weighed approximately 16 or 17 pounds, which was "very, very low" for his age (19 months) and height. AS weighed approximately the same when he was 12 months old. Dr. Schmidt opined that AS should have "gained a significant amount of weight" from when he was 12 months old. The fact that he had not gained a significant amount of weight was "very worrisome." Dr. Schmidt also opined that at his age, AS's weight put him below the first percentile when compared to other boys his age, and AS was at risk of significant harm.

Dr. Schmidt testified that if left untreated, AS's "fluid balance" was so off that he would have suffered permanent brain damage and would not have developed normally. He also would have suffered kidney injury. Dr. Schmidt added that the combination of these conditions could be life-threatening, and AS was treated in the ICU because his conditions were considered life-threatening. According to Dr. Schmidt, the combination of AS's diagnoses suggested that AS "was not being fed and not being given fluids by a caregiver, because at 19 months he's not going to be expected to do that on his own, so he does need a caregiver to supply those things." Dr. Schmidt could not quantify with any degree of certainty how long it would have taken AS to reach the condition he was in when he was presented in the emergency room.

During closing arguments, the parties addressed the element of intent to determine whether defendant should be bound over for first-degree child abuse. Defendant argued the prosecution failed to show that defendant knowingly or intentionally caused serious physical harm or mental harm to AS. According to defendant, the prosecution failed to present any evidence of affirmative acts initiated by defendant. Instead, the evidence only supported that defendant was negligent, which would support a bindover for second-degree child abuse at most. The district court took the parties' arguments under advisement.

Thereafter, the district court issued an opinion and order binding defendant over to the circuit court as charged:

> To determine whether defendant must be bound over to circuit court for trial, this Court must ask whether the defendant "knowingly or intentionally caused serious physical harm" to her 19-month-old child. See *People v Maynor*, 470 Mich 289, 295-297; 683 NW2d 565 (2004). And, under the law, as this Court now interprets it based on the authority discussed, while an omission may serve as the basis for such a finding, the failure to provide food standing alone, while sufficient for a charge of second-degree child abuse, cannot, be the sole basis on which a charge of first-degree child abuse can rest.

> Certainly, there was evidence that defendant failed to provide her child food, water, and nourishment for a significant period of time. There is, however, evidence of more than that omission. In describing the outwardly observable condition of the child, the doctor spoke in terms that would support an inference that the failure to summon medical attention for the child further led to physical harm. The descriptions included observations of the child in an altered state of consciousness, the major weight loss (including a drop in multiple percentiles to less than 1%), and uncontrolled excoriated eczema on the child's skin. A finder of fact could conclude that with such clear objective signs of ongoing medical

-3-

conditions, when defendant failed to summon medical attention or treat the child's ever-worsening skin condition, her failure to act was with the knowledge and/or intent of serious physical harm occurring.

The district court concluded that first-degree child abuse did not require an affirmative act and that there was probable cause to bind over defendant to the circuit court on that charge.

Thereafter, defendant moved the circuit court to quash the bindover and dismiss the first-degree child abuse charge. Defendant argued that the prosecution failed to prove that she had the specific intent required for first-degree child abuse. Defendant contended that the statute required an affirmative act and asserted that the evidence failed to show she acted "intentionally or knowingly." The circuit court denied defendant's motions to quash and dismiss, which defendant now appeals.

## II. STANDARDS OF REVIEW

In *People v Hawkins*, 340 Mich App 155; 985 NW2d 853 (2022), this Court explained the applicable standard of review as follows:

> We review for an abuse of discretion a district court's decision to bind over a defendant. The standard for reviewing a decision for an abuse of discretion is narrow; the result must have been so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias. A circuit court's decision with respect to a motion to quash a bindover order is not entitled to deference because this Court applies the same standard of review to this issue as the circuit court. This Court therefore essentially sits in the same position as the circuit court when determining whether the district court abused its discretion. In other words, this Court reviews the circuit court's decision regarding the motion to quash a bindover only to the extent that it is consistent with the district court's exercise of discretion. The circuit court may only affirm a proper exercise of discretion and reverse an abuse of that discretion. Thus, in simple terms, we review the district court's original exercise of discretion. [*Id*. at 173 (quotation marks and citation omitted).]

"A trial court abuses its discretion when it chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Galloway*, 335 Mich App 629, 637; 967 NW2d 908 (2020) (quotation marks and citation omitted). "A trial court's decision to deny a motion to dismiss is reviewed for an abuse of discretion." *People v Hofman*, 339 Mich App 65, 69; 981 NW2d 112 (2021). We review legal questions, including questions of statutory interpretation, de novo. *Id*.

## III. ANALYSIS

Defendant argues the district court abused its discretion by binding defendant over to circuit court because insufficient evidence established that defendant knowingly or intentionally caused serious harm to AS. We disagree.

The purpose of a preliminary examination is to determine whether a crime has been committed, and, if so, whether probable cause exists to believe that the defendant committed it. *Bennett*, 290 Mich App at 480 (quotation marks and citation omitted). The probable-cause standard "requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003) (quotation marks and citation omitted). To establish that a crime has been committed, the prosecution need not prove each element beyond a reasonable doubt, but it must present some evidence of each element. *Id.*; *People v Henderson*, 282 Mich App 307, 312; 765 NW2d 619 (2009). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). "If the evidence conflicts or raises a reasonable doubt, the defendant should be bound over for trial, where the questions can be resolved by the trier of fact." *Henderson*, 282 Mich App at 312.

Defendant contends that because the prosecution failed to present any evidence of direct affirmative acts committed by defendant to harm AS, there was insufficient evidence that defendant "knowingly or intentionally caused serious physical harm" to AS within the meaning of MCL 750.136b(2). The core of defendant's argument is her belief that only affirmative acts are punishable under MCL 750.136b(2). In support of this argument, defendant compares the first-degree child abuse statute with the second-degree child abuse statute and notes that only the second-degree child abuse statute expressly states that the offense may be committed by omission. This argument is foreclosed by our caselaw interpreting these statutes.

When construing a statute, this Court's goal is to give effect to the intent of the Legislature. *People v DeBono*, 346 Mich App 64, 69; 11 NW3d 546 (2023). We look to the language of the statute itself, which is the most reliable indicator of the Legislature's intent. *Id.* The language of the statute is given its plain meaning and is construed within the overall context in which it is used. *Id.*

Both first-degree and second-degree child abuse are governed by MCL 750.136b. "A person is guilty of child abuse in the first degree if the person *knowingly or intentionally causes* serious physical harm or serious mental harm to a child." MCL 750.136b(2) (emphasis added). The term "serious physical harm" is statutorily defined as "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f). The statute provides three ways in which a person may be found guilty of second-degree child abuse:

> (a) The person's *omission causes serious physical harm or serious mental harm to a child* or if the person's reckless act causes serious physical harm or serious mental harm to a child.

> (b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.

> (c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results. [MCL 750.136b(3)(emphasis added).]

The term "omission" is statutorily defined as "a willful failure to provide food, clothing, or shelter necessary for a child's welfare or willful abandonment of a child." MCL 750.136b(1)(c).

In *Maynor*, 470 Mich at 291-293, the defendant was charged with two counts of felony murder predicated on first-degree child abuse after the defendant left her two young children in her car for three and a half hours on a hot summer day. When she returned to her vehicle, she found the children dead. *Id*. at 292. Our Supreme Court addresses the intent element of first-degree child abuse:

> The plain language of the statute requires that to be convicted of first-degree child abuse, a person "knowingly or intentionally causes serious physical harm or serious mental harm to a child." MCL 750.136b(2). The phrase "knowingly or intentionally" modifies the phrase "causes serious physical or serious mental harm to a child." Thus, this language requires more from defendant than an intent to commit an act. The prosecution must prove that by leaving her children in the car, the defendant intended to cause serious physical or mental harm to the children or that she knew that serious mental or physical harm would be caused by leaving them in the car. [*Maynor*, 470 Mich at 295.]

The *Maynor* Court did not address the distinctions between the elements of the first-degree and second-degree child abuse statutes. However, it and subsequent appellate caselaw have made clear that first-degree child abuse is a specific-intent crime. The "knowingly and intentionally" element of first-degree child abuse requires a showing that the defendant intended to cause serious physical harm or knew that serious harm would be caused. *Id*.; see also *People v McFarlane*, 325 Mich App 507, 513-514; 926 NW2d 339 (2018) (it is not sufficient for the prosecution to prove that a defendant intended to commit the act that caused the physical harm; the prosecution must prove that the "defendant intended to cause serious physical harm or knew that serious physical harm would be caused by [his or] her act") (quotation marks and citation omitted; alteration in original).

More recently, this Court compared the language in the first-degree and second-degree child abuse statutes and concluded that an omission may constitute the *corpus delicti* of first-degree child abuse. *People v Morrow*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 370335); slip op at 8. In *Morrow*, a defendant who pleaded *nolo contendere* to second-degree murder appealed in this Court after the trial court denied his motion to withdraw his plea. See *id*. at ___; slip op at 1-2. The defendant's eight-year-old son had died of starvation and malnutrition. *Id*. at ___; slip op at 1. Before his death, the defendant locked the child in an enclosed spaced and failed to provide food or seek medical care for the child. *Id*. at ___; slip op at 3.

This Court concluded that an omission may satisfy the elements of first-degree child abuse. In its analysis of the child abuse statute, the Court rejected the argument raised in this appeal that by reading the first-degree statute to punish omissions, language in the second-degree child abuse statute would be rendered nugatory. *Id*. at ___; slip op at 8. As noted by defendant, the second-degree child abuse statute expressly provides that one of the three ways in which an individual may commit second-degree child abuse is by omission. MCL 750.136b(3)(a). Unlike the second-degree child abuse statute, the first-degree child abuse statute makes no express reference to "omissions." However, the express inclusion of "omissions" under the second-degree child abuse statute and failure to state the same in the first-degree child abuse statute does not necessitate the

conclusion that the Legislature intended to exclude omissions from punishment under MCL 750.136b(2). Indeed, the first-degree child abuse statute also fails to use the term "act," when describing the manner in which an individual may commit first-degree child abuse, which indicates that first-degree child abuse could be committed by an act or omission. *Morrow*, ___ Mich App at ___; slip op at 8.[3] In contrast, the Legislature deliberately chose to separately list both the terms "act" and "omission" in the second-degree child abuse statute. *People v Peltola*, 489 Mich 174, 185; 803 NW2d 140 (2011) ("Generally, when language is included in one section of a statute but omitted from another section, it is presumed that the drafters acted intentionally and purposely in their inclusion or exclusion.").

Given the plain language and textual differences between the first-degree and second-degree child abuse statutes, we agree with the *Morrow* Court. We likewise specifically hold that first-degree child abuse may be committed by omission.

The key distinction between the two statutes is "whether the defendant intended the harm itself, not whether the defendant intended the act or omission that caused the serious harm." *Morrow*, ___Mich App at ___; slip op at 8. MCL 750.136b(2) is a specific-intent crime, and MCL 750.136b(3)(a) is a general-intent crime. Stated otherwise, to be punishable under the first-degree child abuse statute, the individual must commit the omission with the intent to cause serious physical harm or serious mental harm or know that serious physical harm would be caused by the omission. In contrast, to be punishable under the second-degree child abuse statute, the individual must only intend the act or omission that caused serious harm itself.

In the context of analyzing the defendant's motion to withdraw his plea, the *Morrow* Court concluded that the defendant's conduct of locking a child in an enclosed space, failing to provide food, and failing to seek medical attention for the child despite obvious signs of the child's declining health satisfied the requirements of MCL 750.136b(2). *Id*. at ___; slip op at 9. In this case, we address whether there was sufficient evidence to bind over defendant on the charge of first-degree child abuse. Unlike *Morrow*, this case does not involve an allegation that the child was subject to confinement. However, this case bears similarities in that the evidence suggests defendant did not provide food or seek medical attention for AS, despite obvious signs of the child's severely declining health.

---

[3] The *Morrow* Court also compared the first-degree child abuse statute to the third-degree child abuse statute, MCL 750.136b(5), which uses the same "knowingly or intentionally causes" language. *Morrow*, ___ Mich App at ___; slip op at 8. This Court explained that the defendant's interpretation of the statute requiring an affirmative act would render language in the third-degree child abuse statute nugatory:

> Defendant's argument would result in interpreting MCL 750.136b(5)(a) as: "The person knowingly or intentionally [commits an act that] causes physical harm to a child." In that scenario, both Subsections (5)(a) and (5)(b) would require a knowing or intentional act and physical harm to a child, rendering Subsection (5)(b)'s additional requirement—that the act poses an unreasonable risk of harm or injury to a child—irrelevant. [*Id*.]

-7-

The district court could appropriately draw inferences from the evidence presented in this case to determine that the prosecution presented sufficient evidence that defendant intentionally or knowingly caused serious physical harm to her child. MCL 750.136b(2). The evidence presented at the preliminary examination establishes that defendant was the sole caretaker of AS. While in her care, AS was hospitalized because he had malnutrition and dehydration so severe that he had a dangerously high sodium level and encephalopathy. Because of the encephalopathy, AS was in "an altered level of consciousness" and was difficult to keep awake. In addition, AS's eczema was so uncontrolled and severe that certain areas of his skin were raw, open, and excoriated. Likewise, AS, who was 19 months old, weighed approximately 16 or 17 pounds, which was a troubling weight for a child of his age. During a time in which he should have gained a significant amount of weight, AS had dropped multiple percentiles on the growth chart and fell below the first percentile for his age range, indicating he was severely underweight. From his medical observations, Dr. Schmidt opined that AS was not being fed or given water and that these conditions were life-threatening.

From the evidence presented by the prosecution, the district court could reasonably infer that defendant willfully failed to provide food or water to AS and willfully failed to seek out medical attention despite obvious signs of AS's failing health and that conduct posed a significant danger of serious physical harm. That the prosecution did not present clear evidence of the timeline over which defendant committed these omissions is not fatal to the probable-cause determination. See *Blevins*, 314 Mich App at 357. The evidence presented supported that these omissions were of an ongoing nature, such that AS's condition was able to become life-threatening. Given the child's malnourishment, altered mental state, and severely low weight, one could infer that defendant intended to cause serious physical harm or knew that serious physical harm would result from her failure to provide food and water to AS and from her failure to seek medical attention. Therefore, the district court appropriately drew inferences from the evidence presented in this case to find probable cause to bind over defendant on the first-degree child abuse charge. Likewise, the circuit court did not abuse its discretion by denying defendant's motions to quash and dismiss.

Affirmed.


/s/ James Robert Redford
/s/ Michael J. Kelly
/s/ Kathleen A. Feeney

-8-